**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| Christine Ferrigan, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | Judge: |
| | ) | |
| City of Delray Beach, Florida, | ) | Jury Trial Demanded |
| Terrence Moore, named in his individual | ) | |
| and official capacities, and | ) | |
| Hassan Hadjimiry, named in his individual | ) | |
| and official capacities, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**COMPLAINT**

Plaintiff Christine Ferrigan (Plaintiff) files this complaint against Defendant City of Delray Beach (City or Delray Beach), Defendant Terrence Moore, and Defendant Hassan Hadjimiry (collectively, Defendants), alleging:

**I.  SUMMARY**

1.  Defendants harassed Christine Ferrigan for over two years and ultimately fired her for exposing that partially treated sewer water was flowing into the City's drinking water causing some people and pets to become ill, among other water quality problems.

2.  Ms. Ferrigan repeatedly raised her concerns about water contamination issues to the City's management and external government agencies. Given the City's refusal to fix its persistent public health failures and despite the City's repeated efforts to shut her

down, she doggedly reported the problems to anyone who would listen, including, at some point, to the nonprofit Public Employees for Environmental Responsibility (PEER) and the press. Her managers and co-workers knew of her disclosures, partly because she referenced her disclosures to regulators and PEER in written and oral workplace communications and she was referenced in relevant media reports.

3.   Her disclosures resulted in two lengthy regulatory investigations, including one that ended in a Florida Department of Health (DOH) Consent Order (Consent Order) in 2021 finding at least nine regulatory violations, fining the City more than $1 million, and requiring many corrective actions.[1]

4.   Although two regulators corroborated her disclosures in blistering public reports, the City severely retaliated against Ms. Ferrigan in violation of her constitutional rights to free speech and Florida's Public Whistleblower Act's (PWA), Fla. Stat. § 112.3187, anti-retaliation provisions. She was marginalized, ignored, denied opportunities for advancement in favor of less qualified or accomplished applicants, and ultimately fired during an alleged and patently pretextual "restructuring" in early 2022.

5.   The City's incomprehensible decision to "shoot the messenger" rather than protect the public health by promptly correcting the problems—particularly in the middle of a worldwide pandemic and in the wake of the Flint, Michigan water crisis—put the public at risk and chilled city employees from reporting regulatory and public health violations.

---

[1] *Florida Dep't of Health Palm Beach County v. City of Delray Beach,* File No. WP 038-20, Consent Order, https://www.delraybeachfl.gov/home/showpublisheddocument/10609/637741294329470000.

6. Ms. Ferrigan brings this action to vindicate her rights secured by the U.S. Constitution, the Florida Constitution, and the PWA and to encourage other potential whistleblowers to speak up, particularly when public health is at risk.

## II. PARTIES

7. Plaintiff Christine Ferrigan is a wastewater pretreatment professional with over thirty years of experience in South Florida. Her skill set includes managing programs related to water, wastewater, reclaimed water, pretreatment, backflow prevention, cross-connections, toxicity, hazardous waste, water safety inspections, sampling (including clean and ultra-clean testing), permitting, and evaluating water-related regulatory compliance protocols, ordinances, and training. The City terminated Ms. Ferrigan on January 26, 2022—five days after she filed a written internal complaint that her management was bullying her for cooperating with the DOH investigators and within three months of the issuance of DOH's Consent Order.

8. Defendant Delray Beach is an incorporated municipality in Palm Beach County, Florida, and a "person" under 42 U.S.C. § 1983.

9. Defendant Moore is Delray Beach's City Manager. At all relevant times, he was engaged in managing, supervising, and controlling the operations, activities, affairs, finances, property, personnel, and employment conditions of Delray Beach. Defendant Moore is a "person" under 42 U.S.C. §1983. Defendant Moore is named in his individual and official capacities. He is personally liable for violations of law and relief claimed here.

10. Defendant Hadjimiry is Delray Beach's Utility Director. At all relevant times, he was engaged in managing, supervising, and controlling the operations, activities, affairs, finances, property, personnel, and employment conditions of Delray Beach's Utilities Department. Defendant Hadjimiry is a "person" under 42 U.S.C. §1983. Defendant Hadjimiry is named in his individual and official capacities. He is personally liable for violations of law and relief claimed here.

### III. JURISIDICTION AND VENUE

11. The Court has jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343 (a)(3). The Court has supplemental jurisdiction over Plaintiff's state law claim under 28 U.S.C. § 1367(a).

12. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)-(c) because it is the district in which the events or omissions establishing Ms. Ferrigan's claims occurred.

### IV. FACTUAL ALLEGATIONS

13. In June 2017, Ms. Ferrigan was hired by Delray Beach as an Industrial Pre-Treatment Inspector.

14. For her first eighteen months of employment, Ms. Ferrigan received good evaluations and sought opportunities for promotion.

**Unsafe Drinking Water and Cross-Connection Problems**

4

15. In late November 2018, the Delray Beach Utilities Department received several phone calls from residents indicating that their drinking water was smelly, yellow with algae, and sandy and that some residents and their pets were getting sick.

16. At the time, Ms. Ferrigan inspected parts of the City that had problems like those being reported.  During her inspections, some residents told Ms. Ferrigan that they noticed the drinking water had changed around the time reclaimed water pipes were connected to their properties.

17. The Utilities Department management first blamed the poor water quality on ground disruption, which can cause sediment and other deposits in water pipes to loosen, resulting in discolored water.

18. But relying on her extensive experience, Ms. Ferrigan informed her management, both in writing and orally, that the water she saw during her inspections looked like reclaimed water. She advised that ground disruption was not the probable cause of the problem.

19. Reclaimed water is wastewater that has been partially treated to remove some harmful organisms and substances, such as bacteria, viruses, and heavy metals. *See* Delray Beach Code, Title 5, Chapter 52, Sec. 59.04. But reclaimed water still contains elements that make the water unsafe to drink. For example, reclaimed water can contain blood-borne pathogens, fecal matter, COVID-19, cryptosporidium, and many other contaminants. Thus, in Delray Beach, reclaimed water may be used only for irrigation and other purposes that do not involve the likely ingestion of the water. *See id*. at Sec. 59.13, 59.20.

20. A cross-connection is a point in a plumbing system where a nonpotable substance can mingle with drinking water. *See id*. at Sec. 52.82. Backflow preventers are devices that stop wastewater from flowing backward into drinking water pipes. *Id*.

21. Delray Beach relies on backflow preventers to ensure that dangerous contaminants do not enter the community's potable water system at cross-connection points. *See id*. at Sec. 52.81. Yet as Ms. Ferrigan discovered and reported, the City's water utility pipes were plagued with inadequate backflow protections and other problems.

22. Ms. Ferrigan knew from her experience as an inspector that reclaimed water could contaminate drinking water systems when backflow preventers were not installed or malfunctioned.

23. To confirm her suspicions that reclaimed water was flowing into residents' drinking water, Ms. Ferrigan asked her management for a list of the backflow preventers that had been installed. Management ignored that request.

24. On December 6, 2018, Ms. Ferrigan was directed by her management to initiate cross-connection inspections beginning with the home at 801 S. Ocean Blvd, Delray Beach.

25. Ms. Ferrigan's inspection revealed a cross-connection contamination problem. She promptly reported the discovery to her then-supervisor, Scott Solomon, Manager of Water and Sewer. She told her supervisor to contact State Warning Point (a State Office staffed around the clock that records, analyzes, and shares emergency information with Federal, State, and County partners), DOH, and the Florida Department of

Environmental Protection, to help them respond appropriately. She also prepared to take samples and flush the drinking water system at 801 S Ocean Blvd. to clear the contaminants.

26. On or about December 19, 2018, Delray Beach's Utilities Department management reported the cross-connection issue to DOH but omitted that some residents reported becoming sick.

27. During the first few months of 2019, Delray Beach fired its City Manager and Utilities Department Director. Caryn Gardner-Young, the then-Assistant City Manager, was also reassigned to Acting Director of Utilities.

28. The City Manager is the City's chief administrative officer. City Charter, Art. IV. – Administrative-Executive, Sec, 4.01. She is responsible for oversight of the City's day-to-day operations including employment decisions, offering leadership and guidance to all departments and divisions of city government, as well as implementing policies and programs as prioritized and directed by the Mayor and City Commission. *See id*. at 4.04. The City Manager has final decision-making authority over the City's departments, policies, and employees.

29. The Director of Utilities—also known as Director of Environmental Services— has "all powers, duties, and authorities" to control and manage the Utilities Department, including the "authority and responsibility for the implementation of an effective cross connection control program." Delray Beach Code, Title 5, Chapter 59, Sec. 59.01, 52.82. The Director of Utilities has final decision-making authority over the Utilities Department's policies and employees.

30. On or about March 22, 2019, Ms. Ferrigan met with Mr. Solomon and Deputy Director of Utilities Victor Majtenyi about the ongoing calls from residents to the City complaining about water quality issues—issues that some residents had raised with Ms. Ferrigan personally as she did her cross-connection inspections. The residents' calls were noted by the Utility Department intake staff. Similarly, Ms. Ferrigan documented the complaints she heard in person. During that meeting, Ms. Ferrigan provided Mr. Solomon and Mr. Majtenyi with a written summary of water-quality related complaints from over 20 residents in early 2019. Ms. Ferrigan's summary document also explained that many residents she interacted with were scared of the reclaimed water and were unilaterally disconnecting from the reclaimed water system—a practice that presented an independent set of health hazards.

31. On May 3, 2019, Ms. Ferrigan obtained a copy of the December 19, 2018, report to the DOH concerning the cross-connection issue. She reviewed the report and immediately realized that the former Utilities Department Director had failed to disclose that residents reported the water was making them sick.

32. On or about May 6, 2019, in a phone call, Ms. Ferrigan told Ms. Gardner-Young that the City's report to the DOH about the water contamination because of cross-connection problems was materially incomplete because it omitted that people reported getting sick from the water. Ms. Gardner-Young asked Ms. Ferrigan to provide her with a written chronology of the events.

33. On May 17, 2019, Ms. Ferrigan provided a 19-page document to Ms. Gardner-Young explaining that significant drinking water contamination problems were

detected and investigated beginning in November 2018.  Ms. Ferrigan detailed how the drinking water contamination occurred because of cross-connection problems and that the City mishandled its attempt to remedy the problem. Ms. Ferrigan noted that residents reported getting sick, but that fact was not disclosed to DOH.

34. During that time frame, concerned residents would periodically call the City and ask to speak to Ms. Ferrigan to relay their concerns about water quality. Mr. Majtenyi and Mr. Solomon tried to silence Ms. Ferrigan by explicitly forbidding her from communicating with *any* entity, internally and externally, about the City's water issues. Under the circumstances, it was clear to Ms. Ferrigan that the prohibited entities included DOH and other regulators.

35. Ms. Ferrigan continued to discover cross-connection problems over the next couple of years. She promptly documented and reported her findings to City management as the issues arose.

36. The City and her management became increasingly hostile to Ms. Ferrigan as she continued to raise her concerns. Management isolated her. Mr. Majtenyi told her to retire. Given his role and long work history in the Utilities Department dating back at least a decade, Mr. Majtenyi had his fingerprints on the problems Ms. Ferrigan was exposing, and hewas upset at Ms. Ferrigan for disclosing them.

37. On January 2, 2020, apparently acting on a Delray Beach resident's formal complaint,[2] DOH official Steve Garcia contacted Ms. Ferrigan for information about the City's cross-connection problems.

38. On January 3, 2020, Ms. Ferrigan emailed Neal de Jesus, Delray Beach's Fire Chief and then-Acting City Manager, concerning the City's reclaimed water issues because of the cross-connections problems discovered in 2018. Ms. Ferrigan noted that the City did not previously notify the public or DOH about the subject. She informed Mr. de Jesus that DOH began investigating the matter after a resident complained to DOH. Ms. Ferrigan advised that, in 2019, her management forbade her from speaking with State health officials and that DOH had just contacted her. Given the pattern of ongoing workplace hostility she was experiencing, Ms. Ferrigan asked Mr. de Jesus to consider her email as a request for protection under Florida's whistleblower law.

39. Ms. Ferrigan met with DOH on January 6, 2020, and provided information about the problems with the City's reclaimed water program and the retaliation she was experiencing.

40. On January 30, 2020, Ms. Ferrigan informed Mr. de Jesus that she was cooperating with DOH's investigation into the City's reclaimed water program. She

---

[2] https://thecoastalstar.com/profiles/blogs/delray-beach-city-failed-to-report-residents-sickened-by-wastewat ("Leslie Campbell, who lives on South Ocean Boulevard, called "to complain she was not adequately notified of the cross-connection issue in her neighborhood. (The) cross-connection between drinking water and reclaimed-water lines occurred in late 2018," according to the complaint investigation record. Campbell . . . told Health Department officials to contact Ferrigan for details. . . . .").

explained that DOH requested her report on the cross-connection she discovered on

December 6, 2018, and that she sent the copies to a DOH attorney on January 3, 2020.

**New Utilities Director, PFAS Contamination, and Damage Control**

41. Delray Beach hired Defendant Hadjimiry as the City's Utilities Director in the

summer of 2020.

42. In August 2020, Defendant Hadjimiry received messages from residents

concerning water quality problems.

43. On August 4, 2020, the nonprofit organization Public Employees for

Environmental Responsibility (PEER) issued a press release entitled "Toxic PFAS Taints

Delray And Boynton Beach."[3]  Acting as a concerned private citizen and outside her

official duties, Ms. Ferrigan had communicated with PEER regarding water quality

issues and assisted PEER with obtaining a wastewater sample for testing before PEER

issued its press release.

44. On September 2, 2020, *The Coastal Star* quoted Defendant Hadjimiry saying that

Delray Beach's reclaimed water system is the safest "in the country."[4]

45. On or about September 8, 2020, following Ms. Ferrigan's disclosure to DOH that

Defendant Hadjimiry told her to stop including so much information on inspection

reports despite her explanation that DOH has specifically directed her to include that

---

[3] https://peer.org/toxic-pfas-taints-delray-and-boynton-beach/ (accessed June 22, 2022).
[4] https://thecoastalstar.com/profiles/blogs/delray-beach-utility-director-safest-reclaimed-water-system-in-co (accessed June 22, 2022).

information, the Utilities Department received a warning letter from the DOH for

failing to keep records and clean water storage tanks.

46. On or about September 10, 2020, the Astor Condominium association sent a letter

to the City expressing concern about water quality problems its residents had reported.

It asked for assurances to fix the problems and noted that its homeowners' association

was paying high fees for utilities.

47. On or about September 21, 2020, the DOH reminded the Utilities Department of

the requirements for reporting cross-connection issues, and the Palm Beach County

Office of Inspector General (PB-OIG) issued a letter informing the City that its office

was investigating the City's compliance with DOH's reporting requirements.

48. On September 25, 2020, the PB-OIG sent a letter to Ms. Ferrigan informing her

that she met the statutory requirements for protection under the PWA.

**Media Scrutiny Creates More Pressure on City Officials**

49. On October 28, 2020, *The Coastal Star* published a story entitled "Delray Beach:

Timetable unclear on reclaimed water issues."[5] The article stated, in part:

> More than three months have passed since local DOH environmental
> leaders met with Delray Beach utilities and legal staff to review 13 possible
> violations in the city's reclaimed water program.  "The department expects
> the report to contain a full accounting/inventory and compliance history of
> all reclaimed water connections," wrote Jorge Patino, water, and
> wastewater administrator at the Florida DOH. "Any omissions may be
> construed as reporting violations" . . .

---

[5] https://thecoastalstar.com/profiles/blogs/delray-beach-timetable-unclear-on-reclaimed-water-issues (accessed June 22, 2022).

Patino was alerted to the latest issue by Christine Ferrigan, a Delray Beach utilities inspector, who sent a Sept. 15 email to the environmental health director and the local DOH legal director.

Ferrigan was hired in June 2017, six months before the city contracted with Lanzo Construction to install the reclaimed water system in the southeast portion of the barrier island . . .

In her email to the DOH, Ferrigan wrote about a Sept. 11 meeting with city Utilities Director Hassan Hadjimiry and the department's compliance manager, at which she said she was told "to remove all history of several locations that have shown prior reclaimed violations/cross connections."

Ferrigan explained that the properties were located along South Ocean Boulevard and had converted back to potable water for irrigation because they had a cross connection.

A cross connection discovered there in December 2018 triggered this year's review of the citywide reclaimed water program. A woman who lived in that area called the Tallahassee DOH that informed the local office of the Florida DOH on Jan. 2 to say she was not adequately informed of the 2018 cross connection. A cross connection happens when drinking water pipes are mistakenly connected to reclaimed water pipes.

50. On October 30, 2020, *The Palm Beach Post* published an article entitled "Nonprofit warns of chemicals in Delray Beach water; city insists quality meets standards."[6]

51. On November 18, 2020, local CBS affiliate CBS12 News published a story entitled "Environmental group says there are 'alarming' levels of chemicals in Delray Beach water."[7]

---

[6] https://www.palmbeachpost.com/story/news/local/2020/10/30/nonprofit-warns-chemicals-delray-beach-water-city-insists-standards-met/6077244002/(accessed June 22, 2022).

[7] https://cbs12.com/news/local/environmental-group-says-there-are-alarming-levels-of-chemicals-in-delray-beach-water (accessed June 22, 2022).

52. As described below, Ms. Ferrigan told the Utilities Department management that she helped PEER obtain the water sample underlying its report. Given her outspokenness about her concerns and the nature of the articles, the City and her management strongly suspected or knew that Ms. Ferrigan communicated her concerns to the press.

**The City Responds to Criticism and Scrutiny by Escalating Retaliation**

53. The City and management escalated its retaliation campaign as the regulatory investigations heated up. For example, periodically, Defendant Hadjimiry held fact-finding meetings with Ms. Ferrigan and her colleagues- a team that consisted of Jerry May, Paul DeCarolis and, ultimately, Ms. Magliore and Bradley Hasseler. During those meetings, Defendant Hadjimiry was openly hostile to Ms. Ferrigan. He was patronizing, spoke to her condescendingly, and would often reprimand her.

54. Management deliberately excluded her from meetings about cross-connection issues – she only found out what was discussed at those meetings when attendees shared the contents of those meetings.

55. As the most knowledgeable and experienced person on the team, Ms. Ferrigan was the go-to person for anyone that had questions about water-related issues. Yet management ignored her contributions. Indeed, Defendant Hadjimiry would often tell her to retire.

56. On November 20, 2020, Ms. Ferrigan met with Defendant Hadjimiry, Ralph Lugo, Manager of Water and Sewer, Alicia Magloire, Environmental Compliance Manager, Mr. Majtenyi, and Juan Guevarez, Deputy Director of Utilities, and others to

discuss the PFAS test results published by PEER that the media covered. During the meeting, Ms. Ferrigan revealed that she was the whistleblower who provided PEER with the samples it had tested.

57. On November 29, 2020, Ms. Ferrigan applied for the newly created Cross Connection Control Coordinator position. She had served as a de facto Coordinator for some time without receiving pay commensurate with her responsibilities. In her de facto role, Ms. Ferrigan laid the groundwork and implemented the cross-connection control program, wrote the program's protocols, knew the history and the area, and discovered and sought correction of the cross-connections and violations. The City passed over Ms. Ferrigan despite her unique qualifications for the position.

58. On December 11, 2020, PB-OIG requested additional information for its investigation. Ms. Ferrigan then informed Ms. Magloire that she might have to come in on a Saturday to gather additional information for PB-OIG. In turn, Ms. Magloire informed Defendant Hadjimiry of Ms. Ferrigan's intentions. Defendant Hadjimiry promptly instructed Ms. Ferrigan during a meeting not to come into the office on Saturday and that she was prohibited from talking to PB-OIG. During the meeting, Defendant Hadjimiry relayed to Ms. Ferrigan that he would inform PB-OIG that Ms. Ferrigan could no longer speak to them.

59. Ms. Ferrigan's disclosures to the DOH, PB-OIG, and non-governmental entities such as PEER and journalists, were made on her initiative, outside the scope of her official duties, and the vast majority were made after work hours. She made them because she believed that the public welfare was being compromised by the City's

15

shameful indifference to its residents' welfare. That her disclosures were outside the scope of her official duties was underscored when Defendant Hadjimiry, her direct supervisor and the Director of her department, expressly prohibited her from cooperating with government regulators.

60. On December 13, 2020, Ms. Ferrigan disclosed to the PB-OIG investigator that she was instructed not to cooperate with them.

61. On or about January 7, 2021, the DOH developed a Civil Penalty Authorization Memorandum (Memo), which describes the nature of the City's public health and similar violations related to its drinking water. These were violations that Ms. Ferrigan reported. Ms. Ferrigan is the unnamed "City of Delray Beach Employee" referenced on page 2 of the Memo. The Memo recommended the Director approve a nearly $3 million penalty to negotiate a Consent Order with the City. DOH description of the over a decade-long violations and the potential for $3 million dollar penalty was promptly reported on by the local press.[8]

62. On April 1, 2021, the City passed over Ms. Ferrigan for the newly created Cross-Connection Coordinator position in favor of the lesser qualified Bradley Hasseler. Ms. Ferrigan had *far* more relevant experience than Hasseler, with over three decades of work experience in environmental issues, particularly in cross-connection matters

---

[8] *See*, e.g., https://thecoastalstar.com/profiles/blogs/delray-beach-water-woes-may-bring-3m-in-fines (accessed June 22, 2020); https://cm.palmbeachpost.com/offers-reg/?return=https%3A%2F%2Fwww.palmbeachpost.com%2Fstory%2Fnews%2Flocal%2Fdelray%2F2021%2F01%2F20%2Fdelray-faces-3-million-fine-drinking-water-violations%2F4227580001%2F (accessed June 22, 2020); https://www.bocamag.com/delray-fined/ (accessed June 22, 2020).

including in management positions, since about 1998. In addition, unlike Mr. Hasseler, Ms. Ferrigan was well versed in Florida's Reclaimed Water Program and had deep institutional knowledge of Delray Beach's water problems. Mr. Hassler had no background in Florida water laws and regulations, no experience in Florida's reclaimed water programs, lacked required Florida credentials, and had limited experience with cross-connection issues.

63.  Knowing of her deep expertise and experience, the City often ordered Ms. Ferrigan to train employees (including Ms. Hasseler and Ms. Magliore) on how to do their jobs despite having passed over Ms. Ferrigan for those very positions.

**Palm Beach County Office of Inspector General Finds City Concealed Residents' Illnesses and the Harassment and Retaliation Continues**

64. In early April 2021, Delray Beach removed Ms. Ferrigan from conducting cross-connection inspections.

65. On May 6, 2021, the PB-OIG issued Investigative Report 2020-0007, entitled *Delray Beach Reclaimed Water Reporting.* The report confirmed Ms. Ferrigan's allegation that the City hid reports of sickness or illness that had been received about a cross-contamination incident in their report to the DOH.  Ms. Ferrigan's disclosures are noted throughout the report. The report begins by stating "[i]n February 2020, the Palm Beach County Office of Inspector General (OIG) received a complaint from a whistleblower (WB) alleging City of Delray Beach (City) officials were intentionally concealing from state officials that reclaimed water had contaminated the City's drinking water system and that City residents reported being sickened by the contaminated water." Ms.

Ferrigan's response to the report was included as an attachment to it. City officials knew or strongly suspected that the whistleblower being referred to was Ms. Ferrigan.

66. On July 26, 2021, Ms. Ferrigan received an unjustifiably low evaluation (3.31/5). In past years, Ms. Ferrigan received four-plus evaluation scores. Ironically, even as management retaliated against her, the City was forced to concede in the evaluation that she "positively contributed to the overall performance of the cross-connection control program, reclaimed and industrial pre-treatment programs."

67. On September 7, 2021, Ms. Ferrigan met with Defendant Moore, Assistant Human Resources Director Dot Bast, and Human Resources Specialist B.J. Clay to discuss ongoing retaliation and bullying because she cooperated with government investigations into her disclosures of water contamination. During the meeting, Defendant Moore and others claimed they took Ferrigan's allegations seriously and would investigate them.

**DOH Finds Safe Drinking Water Violations Resulting in Consent Order**

68. On September 30, 2021, NBC affiliate WPTV 5 reported DOH's plan to sue the City "to enforce the city's alleged violations of the Florida Safe Drinking Water Act after the parties were unable to reach an agreement on a proposed consent order."[9]

69. Between June 2019-October 2021, Ms. Ferrigan was contacted many times for advice by employees who wanted to disclose water quality problems they found but

---

[9] https://www.wptv.com/news/local-news/investigations/florida-department-of-health-to-sue-delray-beach-over-alleged-water-violations (accessed on July 22, 2022).

feared retaliation. It is common knowledge among City employees that the City has a well-established pattern of retaliating against those who raise concerns.

70. These concerned but scared employees reported that Defendant Hadjimiry had directed Cross-Connection staff to remove information that was required to be reported in the City's database concerning backflows. In November 2021, again acting outside the scope of official duties, Ms. Ferrigan disclosed these concerns to Rafael Reyes, Director of Environmental Public Health for DOH's Palm Beach County office.

71. City employees also reported to Ms. Ferrigan that management was falsifying and concealing adverse information related to water treatment.

72. The Utilities Department continued to receive complaints from customers concerning yellow or brownish water with suspended solids. A Longhorn Steakhouse in Delray Beach had to temporarily close because its water purification system could not clear up the water.

73. Ms. Ferrigan reported the problems and concerns relayed to her to Mr. Reyes and the DOH's Chief Legal Counsel, Catherine Linton.  Ms. Ferrigan told the health officials everything the employees told her and advised that there were pictures to support the concerns.

74. On November 12, 2021, DOH issued a Consent Order requiring the City of Delray Beach to pay a fine and costs totaling $1,021,193.90.  The Order found the City failed to implement its Cross Connection Control Program from the date of its adoption in 2008. It also found the City violated at least nine regulatory standards concerning its cross-connection program and lists the City's violations, including that the City

"submitted one or more false statements."  The Consent Order mandates a timetable

for corrective actions and required the City to issue a public notice of its failures, among

other things.[10]

75. On November 23, 2021, Ms. Ferrigan, acting outside the scope of official duties,

again contacted Mr. Reyes to report continuing problems with backflows in the City's

water systems.

76. On December 3, 2021, the City issued a notice acknowledging:

> The City of Delray Beach Water Utilities Department (City) failed to
> implement its Cross Connection Control Program from the date of its
> adoption in 2008 until February 4, 2020, as required by Rule 62-555.360 of
> the Florida Administrative Code.  Specifically, the City failed to:
> 1.    Conduct inspections to ensure its distribution system was protected
> from hazards.
> 2.    Ensure backflow prevention was installed on all properties where a
> health, pollution or system hazard to drinking water exists.
> 3.    Evaluate customer's premises for cross-connections and adequate
> backflow protection whenever a customer connects to reclaimed water.
> 4.    Conduct initial and follow-up inspections, testing and complaint
> investigations as well as periodic inspections of customer connections.[11]

77. On December 29, 2021, *The Coastal Star* published a story entitled, "Delray Beach:

City pays fine, published admission of neglect in water program."[12]  The article noted

the City was required to admit four errors that occurred during the period 2008 through

early 2020.  "The city failed to inspect that its distribution system was protected from

---

[10]

https://www.delraybeachfl.gov/home/showpublisheddocument/10609/63774129432
9470000 (Consent Order, Sec. 5) (accessed June 22, 2022);

[11] https://www.delraybeachfl.gov/government/city-departments/utilities/public-
notice-fdoh-consent-order.

[12] https://thecoastalstar.com/profiles/blogs/delray-beach-city-pays-fine-publishes-
admission-of-neglect-in-wat (accessed June 15, 2022) (accessed June 22, 2022).

hazards; to ensure backflow preventers were installed at each reclaimed water site; to

evaluate each location for cross-connections and backflow preventers, and to conduct

initial and follow-up inspections and investigate customer complaints."

**Ms. Ferrigan Reports Water Treatment Problems,
Submits Retaliation Complaint, and is Promptly Terminated**

78. On January 13, 2022, Ms. Ferrigan, again acting outside the scope of official

duties, contacted the DOH because water treatment operators shared their concerns

with her about brownish water with suspended solids leaving the water treatment

plant, customers were complaining about the water, and that City Distribution Crews

were told to flush lines.

79. On January 21, 2022, Ms. Ferrigan submitted a retaliation complaint to the City's

Human Resources Department outlining the history of harassment and retaliation she

experienced because of her reporting to regulators and cooperation with their

subsequent investigations.

80. For example, her complaint describes how:

> [On] 9-15-20 I contacted DOH to report that in a meeting with Hadjimiry &
> Magliore (9-11-20) I was ordered not to report any history on a location. I
> explained to Hadjimiry that I was told by DOH to include everything. He
> was not happy. See email 9-15-20. Hadjimiry has told several employees to
> stay away from me because I am trouble.

81. The internal complaint also described how Defendant Hadjimiry retaliated against

her by exploiting a Delray Beach resident's frustration relating to a cross-connection

inspection. The resident angrily berated Ms. Ferrigan and repeatedly told her that

Defendant Hadjimry said to him that she was responsible for the City's trouble with regulators.

82. The City acknowledged receipt of Ms. Ferrigan's complaint. Defendant Moore, Defendant Hadjimiry, Ms. Bast, Ms. Clay, and others were aware of Ms. Ferrigan's complaint.

83. On the morning of January 26, 2022, with no notice, Delray Beach terminated Ms. Ferrigan. Ms. Bast escorted her out of the building in front of other employees.

84. Thus, the City "eliminated her position" within three months of the DOH Consent Order and within five days of her internal written report that she was being bullied *because* she told DOH that the City instructed her to stop cooperating with DOH's investigations into the water issues.

85. Neither Ms. Ferrigan's whistleblowing nor the City's retaliation were isolated occurrences. Her ongoing disclosures were a source of vital information to government regulators from 2018 until her termination. The regulatory pressure and negative publicity about the City's water problems escalated as she continued to report the City's failures to regulators in near real-time. Despite the pattern of escalating workplace hostility directly resulting from her protected activity—a fact that she also raised in a September 2021 meeting about the ongoing retaliation with Defendant Moore, Ms. Bast, and Ms. Clayton—she persisted.

86. The September 2021 and January 2022 internal complaints highlighting Ms. Ferrigan's cooperation with DOH was further confirmation of what the City knew or suspected – that DOH's imposition of a $1 million fine in November 2021 resulted from,

and was the culmination of, Ms. Ferrigan's whistleblowing about the City's cross-connection problems.

87. The City's asserted reason for her termination was an alleged "reorganization" to close the City's $10 million budget gap for 2021-22. That was pretext. Her position was specifically funded in the 2021-2022 budget adopted four months earlier, on September 23, 2021.[13] In addition, to Ms. Ferrigan's knowledge, hers was the only non-vacant position the City eliminated in the alleged restructuring – not to mention that the elimination of her $53 thousand salary had, at most, a negligible effect on a $10 million budget gap.

88. Delray Beach does not have an official grievance procedure through which Ms. Ferrigan could protest her unlawful termination.

### V. COUNTS

### Count I: Violation of U.S. Const. Amend. 1, 14; 42 U.S.C. § 1983

89. Plaintiff adopts and incorporates by reference paragraphs 1 through 88.

90. Ms. Ferrigan publicly spoke and disclosed to regulators, PEER, and the media, as a citizen, on matters of public concern, including, but not limited to public safety and problems with Delray Beach's water quality. Ms. Ferrigan's right to speak out on these and other matters of public concern was protected by the First and Fourteenth Amendments to the U.S. Constitution. The public has a vital interest in free and open discussion on issues of public importance.

---

[13]https://www.delraybeachfl.gov/home/showpublisheddocument/10071/6376903063 59930000 at page 438/570 (IPP Inspector) (accessed June 22, 2022).

91. On learning that Ms. Ferrigan had spoken out on matters of public concern, Defendants Delray Beach, Moore, and Hadjimiry, separately, and/or jointly, engaged in actions, omissions, and decisions, aimed at denying her the right to speak and write on a matter of public concern. Defendants' actions, omissions, and decisions concerning Ms. Ferrigan were made with reckless or callous disregard for Ms. Ferrigan's rights and were meant to cause, and have caused, her to suffer humiliation and reputational harm, emotional and mental injuries, pain, suffering, and financial and other adverse consequences, for which she seeks full damages and make-whole relief.

92. The Defendant's actions, omissions, and decisions made individually, separately, and/or jointly, were taken in response to, and in retaliation for, Ms. Ferrigan's exercise of her constitutional and lawful right to speak and write on matters of public concern, in violation of her rights safeguarded under the First and Fourteenth Amendment to the U.S. Constitution and laws in violation of 42 U.S.C. § 1983.

93. Defendants' justifications for the adverse actions are false and pretextual.

94. Defendants' actions, omissions, and decisions, as alleged above, make Delray Beach liable to Ms. Ferrigan under 42 U.S.C. § 1983 based on the authority and actual decisions of Defendants Delray Beach, Moore, and Hadjimiry. In addition, such unlawful actions, omissions, and decisions, as alleged above, were based on Defendants Moore's and Hadjimiry's policymaking and final decision-making authority and were based on the City's policy, custom, and practice.

95. Defendants' actions, omissions, and decisions done separately, and/or jointly, as alleged above, were done in a knowing, willful, reckless manner and in bad faith, and

violate clearly established rights of which a reasonable person in Defendants' place would have known.

### Count II: Violation of Fla. Const. Art. I, § 4

96. Plaintiff adopts and incorporates by reference paragraphs 1 through 88.

97. The Florida Constitution provides:

> Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.

Fla. Const. Art. I, § 4.

98. This constitutional protection extends to Delray Beach employees.

99. At all material times, Ms. Ferrigan was a Florida resident.

100. On learning that Ms. Ferrigan had spoken out on matters of public concern, Defendants Delray Beach, Moore, and Hadjimiry separately, and/or jointly, engaged in actions, omissions, and decisions, aimed at denying Plaintiff the right to speak and write freely on a matter of public concern. Defendants' actions, omissions, and decisions, including, but not limited to, terminating Ms. Ferrigan, made with reckless or callous disregard for Ms. Ferrigan's rights and were designed to cause, and have caused, her to suffer humiliation and reputation harm, emotional and mental injuries, pain, suffering, and financial and other adverse consequences, for which she seeks full damages and make-whole relief.

101.  The Defendant's actions, omissions, and decisions made separately, and/or jointly, were taken in response to, and in retaliation for, Ms. Ferrigans' exercise of her constitutional and lawful right to speak and write on a matter of public concern, in violation of her rights safeguarded under Article I, Section 4 of the Florida Constitution.

102.  Defendants' reasons for the adverse actions are false and pretextual.

103.  The Defendants' actions, omissions, and decisions made separately, and/or jointly, as alleged above, were done in a knowing, willful, and reckless manner and in bad faith, and violate clearly established constitutional rights of which a reasonable person in Defendants' place would have known.

### Count III: Violation of the PWA, Fla. Stat. § 112.3187

104. Plaintiff incorporates by Plaintiff adopts and incorporates by reference paragraphs 1 through 88.

105.  At all material times, Ms. Ferrigan was a Delray Beach employee. The City of Delray Beach is covered by the PWA.

106.  Ms. Ferrigan made protected disclosures about the Defendant's violations of federal and Florida law, and Defendant's gross waste, mismanagement, and neglect of duty, all of which created and presented a substantial and special danger to the public health, safety, or welfare.

107.  Ms. Ferrigan made her written disclosures on her own initiative to the appropriate local officials. Ms. Ferrigan also participated in regulatory investigations relating to her disclosures.

108.  Ms. Ferrigan's (i) written disclosures and (ii) participation in regulatory investigations are each a protected activity.

109.  Ms. Ferrigan suffered adverse employment actions, including harassment, bullying, marginalization, unjustifiably low performance evaluations, denial of promotions, and termination.

110.  Ms. Ferrigan's protected activities were the proximate cause of the Defendant's adverse employment actions. Defendant's adverse employment actions constitute illegal retaliation under the PWA.

## IX. PRAYER FOR RELIEF

Plaintiff requests that this Court grant relief against each of the Defendant, individually, separately, and/or jointly:

a. Enter a declaratory judgment that the Defendants have willfully and wrongfully violated their constitutional and legal obligations to Ms. Ferrigan and the public, and deprived the Ms. Ferrigan of her rights, privileges, protections, compensation, and entitlements under law;

b. Enter a declaratory judgment that the City and its management were and are hostile toward Ms. Ferrigan and other employees who engage in conduct protected by Florida law;

c. Reinstating Ms. Ferrigan to the same or equivalent position held before she was terminated and requiring her promotion to the position of Environmental Resources Compliance Manager, or a comparable position with the same or higher salary and benefits, within 90 days of her reinstatement;

    1.  Or, as an alternative to reinstatement, awarding Ms. Ferrigan reasonable front pay.

d.  Awarding Ms. Ferrigan back pay and damages for benefits lost or diminished because she was unlawfully denied promotion and due to her termination;

e.  Awarding Ms. Ferrigan pre-and post-judgment interest;

f.  Awarding Ms. Ferrigan her attorneys' fees, expenses, and costs of litigation;

g.  Awarding Ms. Ferrigan compensatory damages against the Defendants, and punitive damages against Defendant Moore and Defendant Hadjimiry, for her pain, emotional and mental suffering, stress, humiliation, reputational harm, and other losses; and

h.  Awarding such other relief as may be just and appropriate.

## X. JURY DEMAND

Plaintiff requests a jury trial by jury on all claims triable to a jury.

Date: July 25, 2022

Respectfully submitted,

*s/Leslie M. Kroeger*
Leslie M. Kroeger
Florida Bar No.: 989762
Rachael Flanagan
Florida Bar No.: 1018544
Cohen Milstein Sellers & Toll, PLLC
11780 US Highway One Suite 500
Palm Beach Gardens, FL 33408
(561) 515-1400 Phone
Emails:  lkroeger@cohenmilstein.com
         rflangan@cohenmilstein.com

Richard E. Condit (pro hac vice pending)
Cleveland Lawrence III (pro hac vice pending)

C. Ezra Bronstein (pro hac vice pending)
Mehri & Skalet, PLLC
2000 K Street, NW, Suite 325
Washington, DC 20006
Telephone: (202) 822-5100
Fax: (202) 822-4997
Email: rcondit@findjustice.com
          clawrence@findjustice.com
          ebronstein@findjustice.com